**UNITED STATES of America, Plaintiff,**

v.

**ONE 1976 LINCOLN MARK IV, Serial # 6Y89A876578 Michigan License # TWP 951, Defendant.**

**Civ. A. No. 78–537.**

United States District Court, W. D. Pennsylvania.

Jan. 11, 1979.

Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Wayne V. DeLuca, Damian & Damian, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

COHILL, District Judge.

This Court has before it a difficult decision to make between the Government's action for the forfeiture of one 1976 Lincoln Mark IV and the claim to the car by its owner, Paul B. Kallaway, who was totally uninvolved in the criminal activity giving rise to the Government's action against the car.

### FINDINGS OF FACT

The facts were developed at a hearing held before this Court. We find the following to have been established by stipulation and/or by testimony:

From July 6, 1977 to the present, Paul B. Kallaway ("Kallaway") has been the registered owner of a 1976 Lincoln Mark IV, Serial No. 6Y89A876578, Michigan License No. TWP 951 (the "Lincoln"). Kallaway is an employee of Ford Motor Company.

The Lincoln was insured through the Fowler Agency of Southfield, Michigan, from August 11, 1976 through December 30, 1977. It was listed as one of a fleet under a company fleet insurance policy ultimately insured by Citizens Mutual Insurance Company, Howell, Michigan, Policy No. K389873, and the Hartford Insurance Company. One of the named insured parties under this policy was Robert J. Pesci ("Pesci").

Kallaway and Pesci are brothers-in-law, their two wives being sisters. Pesci owned a trucking company, Franco Freight. Although Kallaway was the sole owner of the Lincoln, he had his brother-in-law insure it through the Franco Freight fleet policy noted above because Kallaway purchased the car from Ford to resell it.

In September of 1977, Kallaway was residing at Pesci's house, 14626 LeBlanc, Lincoln Park, Michigan. Kallaway and Pesci had been living together since June, 1977, because Kallaway had sold his house and

was waiting for construction of a new house to be completed. Both their wives were staying at their family's vacation cottage. On September 19, 1977, Pesci asked for, and was granted, permission to use the Lincoln. (The specific arrangement is in dispute: Kallaway testified that he loaned Pesci the car because Pesci's van was in the repair shop, but the Government contends that Kallaway gave Pesci the car over the weekend in exchange for the use of Pesci's van over the same weekend.) Pesci had used the car on several earlier occasions.

Early in the morning hours of September 20, 1977, Pesci, along with one Charles Benevides, was arrested by Agents of the Drug Enforcement Administration (DEA) in the parking lot of the Holiday Inn in Coraopolis, Pennsylvania. The arrest occurred after Benevides and Pesci had transferred thirteen ounces of heroin for an agreed price of $16,900 to Agent Carroll Gibson who at the time was acting in an undercover capacity as a street dealer.

The arrests were the culmination of several months of undercover work by Agent Gibson and others during which time Gibson had met once with Benevides at the Detroit International Airport and spoken with him several times by phone. At the Detroit meeting, Gibson had purchased three ounces of heroin from Benevides for $4,500.00. On or about September 15 and 16, 1977, Agent Gibson, relying on what had been told to him by one Arturo Montano, was expecting Benevides to bring two pounds of heroin to Pittsburgh.

Late in the day on September 19, 1977, Benevides called "Boots" Gipson (a government informant involved in this investigation and not to be confused with Agent Gibson) to advise that he was in Pittsburgh and to arrange a meeting with Gibson. Informant Gipson went to the Holiday Inn in Coraopolis, Pennsylvania, met Benevides in the lobby and then went to Pesci's room, where Pesci showed him thirteen ounces of heroin he had hidden under the mattress. Benevides then left the motel with informant Gipson to go back to Gipson's apartment, stopping first to get a change of clothes from the Lincoln in the motel parking lot.

Negotiations for the sale transpired later the same evening at a bar inside the Holiday Inn with Pesci setting the price per ounce and computing the amount of the sale. Agent Gibson also initiated negotiations for a future, larger sale through Pesci.

The transfer occurred inside Agent Gibson's car in the motel parking lot, with Gibson, informant Gipson, Pesci, and Benevides present, and with the actual exchange of drugs and money passing between Benevides and Agent Gibson. After other agents closed in for the arrest, Pesci gave Agent Gibson the keys to the Lincoln.

Pursuant to this arrest, the Lincoln, which had been used by Pesci and Benevides to travel from Detroit to Pittsburgh in order to negotiate and carry out the heroin transfer, was seized in Coraopolis, Pennsylvania, by duly authorized agents of the DEA. Thereafter, the United States brought this civil action for forfeiture of the Lincoln, pursuant to 49 U.S.C. §§ 781 and 782 and 21 U.S.C. § 881, 28 U.S.C. §§ 1345 and 1355 and 19 U.S.C. § 1610.

The Government has no evidence which would implicate Kallaway in any way in the events surrounding the arrests of Pesci and Benevides on September 20, 1977. There is also no evidence that Kallaway had any knowledge on September 19, 1977 that his car, the Lincoln, would be used in a scheme to distribute narcotics, nor that he even had any knowledge that the car was being taken to Pittsburgh. He testified that he would not have loaned Pesci the car if he had known Pesci had planned to go to Pittsburgh. At the time Kallaway loaned his car to Pesci, he did know that Pesci had been convicted of a securities violation in 1973 and had served time for this offense. However, he testified he had no knowledge that Pesci was involved with drugs.

Kallaway filed a claim for the Lincoln with this Court on May 26, 1978 and has contested the legality of the seizure. He also filed a petition for remission with the Attorney General pursuant to 19 U.S.C. § 1618, but was denied relief.

## CONCLUSIONS OF LAW

■ The Government did have probable cause to believe that the Lincoln was used to transport narcotics or to facilitate the sale of narcotics, and the Lincoln was therefore properly seized. There is sufficient evidence to establish probable cause without the testimony of the Government witnesses which the claimant has objected to as hearsay. Probable cause for seizure having been demonstrated by the Government, forfeiture was established, and the burden shifted to the claimant to prove the forfeiture was not within 21 U.S.C. § 881 and 49 U.S.C. §§ 781–782.

■ Innocence of crime, by itself, is not a defense to a forfeiture proceeding. *U. S. v. One 1971 Lincoln Continental,* 460 F.2d 273 (8th Cir. 1972); *U. S. v. One 1961 Cadillac,* 337 F.2d 730 (6th Cir. 1964). Courts have little, if any, discretion in statutory forfeiture cases, and authority to remit forfeiture in appropriate cases is vested in representatives of the executive branch of government, not in the judiciary. 18 U.S.C. § 3617, *U. S. v. One 1971 Porsche Coupe,* 364 F.Supp. 745 (E.D.Pa.1973).

■ Provisions vesting unlimited discretion in the Attorney General to remit forfeiture of vehicles used in violation of federal regulations do not bear on the constitutionality of forfeiture in individual cases. *U. S. v. One 1962 Ford Thunderbird,* 232 F.Supp. 1019 (N.D.Ill.1964).

The United States Supreme Court has recognized a narrow exception to its general holding that forfeiture statutes are constitutional even where the owner of a forfeited vehicle is innocent of the crime with which the vehicle is charged. *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 690, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

■ In order to fit within the constitutional claim exception to the forfeiture statute the owner of a vehicle must prove "not only that he was uninvolved in and unaware of the wrongful activity but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S 663, 689, 94 S.Ct. 2080, 2095, 40 L.Ed.2d 452 (1974).

■ It has been stipulated by the parties as a matter of fact that the claimant herein was uninvolved in and unaware of any wrongful activity, and since the Court finds that he acted as a reasonably prudent person under all the circumstances, doing all that could be expected of him to prevent illegal use of his property, forfeiture in this case would be improper under the standard established by the Supreme Court. Nor would the purpose of the forfeiture statute —"to impose a penalty only upon those who are significantly involved in a criminal enterprise" be furthered by its use in this case. *United States v. United States Coin and Currency,* 401 U.S. 715, 721–22, 91 S.Ct. 1041, 1045, 28 L.Ed.2d 434 (1971).

Therefore, the Government's petition for forfeiture will be denied.

## DISCUSSION

This is indeed a difficult area of the law—one in which logic and legal principle struggle against established precedent and practice. District courts which have recently taken up the battle have split in their decisions and differed in their reasoning.

In this case we are asked to decide whether Mr. Kallaway, who the Government admits was not in any way involved in illegal activity, must forfeit an automobile which he lawfully owns because that automobile itself was involved in criminal activity.

### I.

*The Hearsay Question and Probable Cause*

■ We will first dispose of a hearsay question raised during the forfeiture hearing before discussing the state of the law in forfeiture actions. The claimant, Kallaway, objected to the testimony of several government witnesses which included statements made to them by the criminal defendants, Pesci and Benevides, as hearsay. The Government has argued that the statements are admissible. Reviewing the evi-

dence and other testimony, we find that the Government has sufficiently established probable cause to seize the vehicle *absent the contested testimony,* so the hearsay question need not be decided.

■ The probable cause necessary in the context of forfeiture statutes is a reasonable ground for belief of guilt—or as the Fifth Circuit has phrased it, "less than prima facie proof but more than mere suspicion," *United States v. One 1975 Ford F100 Pickup Truck,* 558 F.2d 755 (5th Cir. 1977). *See also U. S. v. One 1971 Chevrolet Corvette,* 393 F.Supp. 344, 346 (E.D.Pa.1975); *U. S. v. One Dodge Van,* 416 F.Supp. 43 (E.D.Mich.1976).

In *U. S. v. One 1975 Lincoln Continental,* 72 F.R.D. 535 (S.D.N.Y.1976), the Government met its burden of establishing probable cause by producing circumstantial evidence leading to a reasonable inference of use of the vehicle for trafficking in drugs. In the case at hand the Government has established that Pesci and Benevides came from Detroit to Pittsburgh for the purpose of completing a planned drug transaction, that Pesci had borrowed the Lincoln from Kallaway in Michigan on September 19, 1977 and that the same car was seized in Pittsburgh in the early hours of September 20 after Pesci's arrest; also, that Benevides had previously sold heroin to a DEA agent at the Detroit airport, and that Pesci and Benevides sold heroin to a DEA agent in Pittsburgh on September 20, 1977.

■ To be sure, since the sale was consummated in the agent's car, there is no direct proof that the drugs were ever inside the Lincoln. However, the most reasonable inference to be drawn from the facts proven is that Pesci and Benevides brought the heroin from Detroit to Pittsburgh to sell it here. Moreover, even if they had secured the drugs after arriving in Pittsburgh, there is precedent allowing the Court to find facilitation of the sale through the use of a vehicle even though drugs were not present in the vehicle. *See United States v. One 1974 Cadillac Eldorado,* 548 F.2d 421, 426 (2d Cir. 1977) (automobile may be used to facilitate narcotics sale although drugs not physically transported by automobile); *U. S. v. One 1941 Pontiac Sedan,* 83 F.Supp. 999 (S.D.N.Y.1948) (transporting drug peddler to and from place of advance payment sufficient).

## II.

### *The Nature of a Forfeiture Proceeding*

■ The basic nature of a forfeiture proceeding is an *in rem* action against the vehicle itself, *U. S. v. One 1971 Chevrolet Corvette,* 393 F.Supp. 344 (E.D.Pa.1975), pursuant to the fiction that the vehicle is guilty of facilitating crime, *Various Items of Personal Property v. U. S.,* 282 U. S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931); *U. S. v. One 1940 Packard Coupe,* 36 F.Supp. 788 (D.Mass.1941). Once the Government has established probable cause for seizure of the vehicle, forfeiture is automatic unless the claimant can absolve the vehicle from culpability, *U. S. v. One 1972 Toyota Mark II,* 505 F.2d 1162 (8th Cir. 1974), or establish that the forfeiture is not properly within the forfeiture statute,[1] *U. S. v. One 1973 Pontiac Grand AM,* 413 F.Supp. 163 (W.D. Tex.1976); *U. S. v. One 1973 Volvo,* 377 F.Supp. 810 (W.D.Tex.1974).

For years many cases held that the only exceptions to the forfeiture of vehicles were those contained in the literal language of the statute itself at 21 U.S.C. § 881(a)(4)— exceptions for common carriers and stolen vehicles:

"(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1) All controlled substances which have been manufactured, distributed, dis-

---

1. Additionally, any claimant may petition the Attorney General for remission or mitigation. However, the Attorney General's determination is a discretionary one, remission being a matter of grace, not of right. The federal courts have no power to intervene in the Attorney General's decision where forfeiture is otherwise proper. This mechanism for relief does not bear upon the legal question of whether a particular case falls within the forfeiture statute. *U. S. v. One 1962 Ford Thunderbird,* 232 F.Supp. 1019 (N.D.Ill.1964).

pensed, or acquired in violation of this subchapter.

.   .   .   .   .

(4) All conveyances, including aircraft, vehicles, or vessels, which are used or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2), except that—

(A) no conveyance used by any person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to a violation of this subchapter or subchapter II of this chapter; and

(B) no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States, or of any State."

Many cases have held that the innocence of the owner of the vehicle is no defense to a forfeiture action. *United States v. One 1973 Buick Riviera,* 560 F.2d 897, 900 (8th Cir. 1977); *United States v. One 1967 Cadillac Coupe Eldorado,* 415 F.2d 647, 648 (9th Cir. 1969); *United States v. One 1973 Pace Arrow M300 Motor Home,* 379 F.Supp. 223, 225 (C.D.Cal.1974).

The harshness of the forfeiture statutes was criticized by the United States Supreme Court in *United States v. United States Coin and Currency,* 401 U.S. 715, 719–21, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1971), in a passage that bears repetition here:

"If we were writing on a clean slate, this claim that § 7302 operates to deprive totally innocent people of their property would hardly be compelling. Although it is true that the statute does not specifi-

cally state that the property shall be seized only if its owner significantly participated in the criminal enterprise, we would not readily infer that Congress intended a different meaning. However, as our past decisions have recognized, centuries of history support the Government's claim that forfeiture statutes similar to this one have an extraordinarily broad scope. Traditionally, forfeiture actions have proceeded upon the fiction that inanimate objects themselves can be guilty of wrongdoing. Simply put, the theory has been that if the object is 'guilty,' it should be held forfeit. . . The forfeiture action in the present case was instituted in an in rem proceeding in which the money itself is the formal respondent. More remarkable, the Government's complaint charges the money with the commission of an actionable wrong.

It would appear then that history does support the Government's contention regarding the operation of this forfeiture statute, as do several decisions rendered by the courts of appeals. But before the Government's attempt to distinguish the Boyd case could even begin to convince, we would first have to be satisfied that a forfeiture statute, with such a broad sweep, did not raise serious constitutional questions under that portion of the Fifth Amendment which commands that no person shall be 'deprived of  .  .  . property, without due process of law; nor shall private property be taken for public use, without just compensation.' Even Blackstone, who is not known as a biting critic of the English legal tradition, condemned the seizure of the property of the innocent as based upon a 'superstition' inherited from the 'blind days' of feudalism. And this Court in the past has recognized the difficulty of reconciling the broad scope of traditional forfeiture doctrine with the requirements of the Fifth Amendment." (footnotes and citations omitted).

The real issue in *United States Coin and Currency* was whether a forfeiture proceeding could be considered a criminal proceed-

ing such that the Fifth Amendment privilege against self-incrimination could be invoked; for that reason, the Supreme Court did not further "pursue the inquiry" quoted above, 401 U.S. at 721, 91 S.Ct. 1041. However, along the way to concluding that the Fifth Amendment privilege did attach in a forfeiture proceeding, the Court summarized that "[w]hen the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise." 401 U.S. at 721–22, 91 S.Ct. at 1045. Three years after deciding *United States Coin and Currency,* the Supreme Court reconsidered the forfeiture statutes in *Calero-Toledo v. Pearson Yacht Leasing Company,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), *reh. denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974). In that case, the Court upheld the application of a Puerto Rican forfeiture statute to the lessor of a yacht which was leased to narcotics smugglers. However, at the same time, the Court expressly left open for future decision the case of an owner who was innocent of crime and who had done all that reasonably could be expected of him to prevent misuse of his property, distinguishing that kind of case and suggesting that such a claimant should be constitutionally exempt from the operation of the forfeiture statutes:

"[I]t would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. . . . Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive."

416 U.S. at 689–90, 94 S.Ct. at 2094. Several district courts have attempted to interpret the *United States Coin and Currency* and *Pearson* language in subsequent cases where constitutional challenges to the forfeiture statutes have been made.

In *United States v. One 1974 Mercury Cougar XR–7,* 397 F.Supp. 1325 (C.D.Cal. 1975), a California district court denied forfeiture on a set of facts not too different from those before us. In that case a young woman had loaned her sports car to her boyfriend in exchange for his larger model car in order that he might take a friend to an airport and she might pick up several other friends for an outing. The woman's car was subsequently seized at a local hotel after a passenger attempted to sell heroin to undercover agents. The facts surrounding the arrest and the involvement of the car owner's boyfriend are unclear. The district court found as a matter of fact that:

"Claimant Starks [the owner] was not involved in or aware of the wrongful activity and did all that reasonably could be expected to prevent the proscribed use of her property. Ms. Starks was undoubtedly very familiar with Mr. Mike in that they lived together from August 1974 to February 1975, but there is nothing in the record before this court to indicate her knowledge of any involvement by Mr. Mike in narcotics trafficking generally nor anything to indicate her or Mr. Mike's awareness that the trip to the airport would ultimately involve an attempted narcotics sale by the latter's passenger." 397 F.Supp. at 1327.

The Court then went on to say,

"Under such circumstances, I can see no legitimate purpose that would be served by a forfeiture here and in applying *Pearson Yacht Leasing* could well conclude that an order of forfeiture would deprive claimant of her due process rights." 397 F.Supp. at 1328.[2]

---

2. The *Mercury Cougar* court went on to find that the Attorney General had abused his discretion in failing to grant remission under the facts of that case. Since we believe the mechanism for administrative review to be independent of the claim before us, that the forfeiture here is not constitutionally within operation of the statute, *see* note 1, *supra,* we need not reach such a conclusion.

*See also, U. S. v. One 1971 Ford Truck,* 346 F.Supp. 613 (C.D.Cal.1972) (forfeiture denied where son used car in manner other than authorized by father-owner).

Another recent case in which the effect of the *Pearson* case on forfeiture law was examined arose in the Eastern District of Pennsylvania. In *United States v. One 1971 Chevrolet Corvette,* 393 F.Supp. 344 (E.D.Pa.1975), the claimant against forfeiture of an automobile owned by the entireties was the wife, who proved the car was purchased with her earnings, was used primarily by her and was considered by the couple to be "her" car although titled in both names. It was also established, however, that the husband had a history of criminal activity of which the wife was aware to the extent that "she had warned him on numerous occasions not to involve her property"; nevertheless, she gave him a set of keys to her car. 393 F.Supp. at 345. After the husband had driven the car to a shopping mall with counterfeit money in his possession, he was arrested and the car seized. The wife claimed, *inter alia,* that she was the innocent owner, uninvolved in and unaware of the criminal activity, and that she had done all that could reasonably have been expected of her to prevent illegal use of her property. Characterizing the Supreme Court's exception to the rule that innocence of the owner is irrelevant as a "narrowly circumscribed" one, Judge Luongo determined that the claimant did not fit within its confines.

"[I]t is clear that Mrs. Fisher did not take all steps that could reasonably be expected to prevent her husband from using the vehicle for illicit purposes. Her testimony was that she did permit her husband to use the vehicle and that she even gave him a set of keys for his use. In light of the husband's criminal background, this would have been enough to warrant forfeiture of her vehicle. To that must be added, in this case, the fact that Mrs. Fisher voluntarily titled the vehicle in the names of both as tenants by the entireties. With this title owner-

ship, under Pennsylvania law, . . . it is at least questionable that Mrs. Fisher had the power to restrict her husband's use of the vehicle." 393 F.Supp. at 348. We can find no circuit court cases which give guidance on the application of the *Pearson* exception to specific factual situations. However, the Ninth Circuit, reversing a summary judgment in favor of the government in a forfeiture proceeding, held that in light of recent appellate opinions a claimant was entitled to an opportunity to prove he had done everything he reasonably could do to avoid having the vehicle put to an unlawful use. *U. S. v. One 1972 Chevrolet Blazer,* 563 F.2d 1386 (9th Cir. 1977).

### Conclusion

The language of the Supreme Court in *Pearson* — "that he had done all that reasonably could be expected to prevent the proscribed use of his property"—is difficult to apply. It connotes an affirmative duty, whereas innocence of crime and ignorance of potential wrongdoing are passive conditions. On the other hand, a truly affirmative duty to prevent one's property from being used illegally might only be triggered by knowledge or suspicion of potential wrongdoing. Where one knows of another's criminal involvement, as in *Corvette, supra,* one might be charged with a greater degree of care than in a case where no such knowledge is established. Thus, what one "reasonably could be expected [to do]" to prevent criminal use of property is a standard that must be tailored to individual circumstances.

We believe the case before us to be a close one. We find, however, that Mr. Kallaway did all that could be reasonably expected of him to prevent illegal use of the vehicle in issue.

■■■ The rationale for the forfeiture statutes is to remove the operating tools of crime from criminals, *U. S. v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974). The practical results of forfeiture here would be only to deprive an innocent party of his car.

Determining that Mr. Kallaway acted reasonably under all the circumstances of this case, considering carefully the language of the Supreme Court in *United States Coin and Currency* and in *Pearson,* and realizing that neither the purposes of the forfeiture statute nor the enforcement of the related criminal statutes would in any sense be furthered by a contrary ruling, we choose to follow what we perceive to be the dictates of logic, common sense and a new trend in the district courts and find that forfeiture of Mr. Kallaway's vehicle is not constitutionally within the application of the forfeiture statutes of 21 U.S.C. § 881 and 49 U.S.C. §§ 781–782.

We recognize that some courts have continued to apply the forfeiture statutes without permitting any judicially-made exceptions. *See United States v. Four Pinball Machines,* 429 F.Supp. 1002, 1009 (D.Hawaii 1977) (criticizing *One Mercury Cougar, supra*). It would be possible to reach an opposite conclusion here, citing reputable authority. We could do so from respect for precedent but not with any real conviction that our decision to deny Mr. Kallaway's claim was the correct result, or any assurance that such a decision would be upheld on appeal. Although we have found no recent Third Circuit case considering the issue here, we note that in a 1971 case involving an issue of probable cause for forfeiture, Judge Van Dusen wrote,

> "The [Supreme] Court in *Coin & Currency* also rejected the view that forfeiture statutes operate on property irrespective of whether the owner of that property significantly participated in a criminal enterprise, and held that forfeiture statutes were intended to impose a penalty 'only upon those who are significantly involved in a criminal enterprise.'" (citation omitted)

*United States v. 1964 Ford Thunderbird,* 445 F.2d 1064, 1069–1070 (3d Cir. 1971).

An appropriate order will be entered.