UNITED STATES of America, Plaintiff,

v.

ONE MERCEDES–BENZ 380 SEL VIN.
# WDBCA 33A1BB10331, Defendant.

No. 83 Civ. 643–CSH.

United States District Court,
S.D. New York.

Sept. 20, 1984.

Rudolph W. Giuliana, U.S. Atty. for the S.D.N.Y., New York City, for the United States; Richard A. Simpson, Asst. U.S. Atty., New York City, of counsel.

Hanley, Krisel & Goble, New York City, for claimant William A. Staton; Maryellen Goble, New York City, of counsel.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, District Judge:

The Government brings this forfeiture proceeding against the defendant automobile pursuant to 21 U.S.C. § 881(a)(4). The statute subjects to forfeiture to the United States all "conveyances ... which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment" of those species of property proscribed by federal drug laws.

Following seizure of the vehicle, its registered owner, William Staton, filed a claim and contested forfeiture. The case was tried to the Court. The following constitute my findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

*Findings of Fact*

In July, August and September, 1982, Julio Mercado, a special agent of the Drug Enforcement Agency ("DEA"), and other agents were conducting an investigation of one Robert Brown, a suspected dealer in heroin. Mercado and other agents acted in undercover capacities in their dealings with Brown. The agents were posing as sellers of significant quantities of heroin. I need not recount the full details of the investigation, surveillance and negotiations as revealed by the evidence. It is sufficient to say that on September 15, 1982, Brown and his associate, one Bernard Barnett, agreed to meet the undercover agents outside a diner in Manhattan to consummate a purchase of heroin. Brown said he would be driving a black Mercedes. In fact, Brown appeared for the transaction driving such a vehicle. Mercado gave Brown and Barnett bags of non-narcotic white powder, Barnett handed over the agreed amount of cash, and surveillance unit agents arrested Brown and Barnett.

The car which Brown had driven to the meeting was the claimant's car, and forms the subject matter of this action.

Claimant's Mercedes was taken by DEA agents to the DEA garage, where it was inventoried. A search of the vehicle revealed a written authorization from its owner, claimant William Staton, to one William Brewington, giving Brewington permission to drive the car. Various documents were also discovered, including an envelope containing a $10 bill and a white powder. The powder was taken to the DEA offices and field tested. It checked out positive for heroin. A subsequent laboratory analysis identified the substance at cocaine. The evidence does not fully explain the discrepancy in test results. In the view I take of the case, I need not resolve it.

At the pertinent times, Staton was and remains a successful executive in the recorded music industry. After four or five years with RCA Records in New York, in July 1981 Staton accepted employment with Electric Records, based in Los Angeles. In January, 1983 Staton left Electric and rejoined RCA, as vice-president of the black music marketing department. He is presently an independent consultant. At the pertinent times, however, he was employed by Electric Records in Los Angeles.

Staton had purchased the Mercedes car at issue in April, 1981. He paid $40,000 for it. When he joined Electric Records several months later, and had to transfer to Los Angeles, Staton concluded that he did not need his car there, because the company furnished him with one. In consequence, Staton made arrangements to leave the Mercedes in New York under the care of William Brewington.

Staton had known Brewington for about four to five years. He considered that he knew Brewington well. Staton, an increasingly successful business man, had extended help to Brewington by giving the latter a variety of odd jobs to do. Brewington was handy at electricity, plumbing and carpentry; and at the pertinent times, Staton was the lessee of a building containing a

roller rink on West 155th Street in Manhattan. Staton held an option to purchase the building, and had potential plans for its development; Brewington kept an eye on the place and assisted Staton in dealing with contractors. Brewington had also performed some messenger and delivery services for Staton while Staton was at RCA.

When Staton left for Los Angeles, he left his Mercedes in Brewington's care. It was kept on the leased premises. Staton executed a letter on RCA stationery, dated June 16, 1981, addressed "To Whom It May Concern" (CX A), which stated: "Willie Brewington is my personal driver and has access to my car 24 hours a day." The notice went on to describe the car as a black 1981 Mercedes Benz, and gave the serial number, license number, and insurance particulars, together with telephone numbers at which Staton could be reached in case of need.

Staton testified that he was aware Brewington was on parole from a prior criminal conviction. He testified, however, that he did not know what the conviction was for, and did not ask Brewington about it. In point of fact, Brewington had served three years in prison for conviction of conspiracy to traffic in heroin and cocaine.

Staton phrased the notice concerning Brewington as he did because he did not wish Brewington to have any difficulty if he used Staton's car, which Staton gave him permission to do. In fact, Brewington was not Staton's "personal driver" in the sense that Staton employed him as a chauffeur. It is more accurate to characterize Brewington as a friend, in whose hands Staton thought he could leave the car safely. There is no question that Staton gave Brewington an unfettered ability to drive the car himself. Staton testified that he did not intend to authorize Brewington to sell the car, or to loan it to others; but he could not recall specifically instructing Brewington not to lend the car to others, and there is no writing in evidence imposing such a limitation.

For his part, Brewington testified that Staton left the car in his care. Brewington said that, according to his understanding, he was permitted to use the car, but he was not supposed to lend it to others, or of course to sell it or give it away. But Brewington, no more than Staton, could not describe in his testimony any direct or specific conversations with Staton prohibiting a loan of the car to others; and Brewington acknowledged on cross-examination that, prior to the incidents in question, he had loaned the car to a number of individuals, including Robert Brown, Brown's uncle and daughter, and an unnamed friend whose car had broken down.

As the legal discussion *infra* shows, it is to Staton's interest in pressing his claim to the car to demonstrate that he placed restrictions upon Brewington in respect of its use. Brewington would, in the circumstances of their relationship, be naturally expected to regard Staton not only as an employer but as a benefactor. Accordingly, Brewington's testimony that he understood that he was not to loan the car to others may arguably be regarded as an act of loyalty, of doubtful credibility. That inference is strengthened by the frequency with which he concededly loaned the car to other people. I do not believe that Brewington would have deliberately and repeatedly acted contrary to Staton's directions.

In short, I find from the credible evidence that Staton left the car in Brewington's care; that, save for the written authorization which insured Brewington against difficulty if he was stopped while driving the car, the arrangement was quite informal; and that Staton neither imposed nor Brewington comprehended restrictions about the possible use of the car by others.

It is also pertinent to note that Staton, Brewington and Brown frequented social clubs on the upper west side of Manhattan where people openly used cocaine. Staton, in his testimony, denied any personal use, and nothing in the evidence suggests otherwise. But he did testify that he had attended clubs, one of them being the "Big Track Club" on West 145th Street, where people could be seen ingesting cocaine, and

that Brewington, to Staton's knowledge, also visited such clubs. Again, there is no evidence that Brewington used drugs himself. Robert Brown, who was brought down on a writ from prison to testify, also testified that he had seen Staton and Brewington at social clubs where cocaine was openly used. Brown was admittedly a user.

Against this background, I come to the events of mid-September, 1982, which culminated in the forfeiture of the car. That forfeiture was the last link in a chain of events which began when Brewington loaned the Mercedes to Robert Brown. Both Brewington and Brown gave evidence on the point. There are some discrepancies. I will consider their testimony in detail. Staton has nothing to add of his own knowledge, because he was in Los Angeles at the time.

Brewington testified that on a Monday, Brown drove a rented car to the roller rink premises on West 155th Street and asked Brewington to lend him the Mercedes. According to Brewington, he was at first reluctant, but Brown talked him into it. Brewington testified that he told Brown to return the car before he, Brewington, went off work that afternoon. Brown left his rented car at the 155th Street building, and its keys in Brewington's possession. Brown did not return the car on time. Brewington waited for him, left the building at 7:00 p.m. to visit a friend, and returned to the building at 11:00 p.m. The Mercedes had still not been returned. Brewington used Brown's rented car to go home.

It is common ground that Brown and Barnett were arrested, and the Mercedes seized, on September 15, 1982, which was a Wednesday. I find therefore that Brewington, in describing events that occurred "on a Monday," was referring to Monday, September 13.

The next morning, Tuesday, September 14, Brewington went to Brown's residence. Brown was not there. The Mercedes was not there. Brewington visited a number of Brown's customary haunts, leaving word for him. He could not find Brown during the course of that day, or during the day following.

At about 7:00 p.m. on Wednesday, September 15, Brewington learned from Brown's girlfriend that Brown had been arrested. Brewington reported to Staton by telephone that night. Staton was not pleased. He instructed Brewington to attempt to regain possession of the car. Those efforts, of course, did not succeed.

Brown testified that he borrowed the Mercedes from Brewington about September 9, having agreed to return it on Monday, September 13. Brown testified that he deliberately kept the car past that deadline. Brown testified that he frequently placed or removed his own possessions from the trunk of the car, and he believes that the small quantity of cocaine found in the trunk during the DEA inventory belonged to him. Brown based that conclusion upon the fact that he was using cocaine at the time, whereas, to his knowledge at least, Brewington and Staton were not using cocaine.

While the testimony of these two witnesses in respect of timing of the loan of the Mercedes is in conflict, I do not regard the discrepancy as particularly significant. According to Brewington, Brown borrowed the car on the morning of September 13 and promised to return it later that day. According to Brown, he borrowed the car on September 9 and promised to return it at the end of the day on September 13. In either event, September 13 was the promised return day, and Brown deliberately kept the car beyond that date, leading to its forfeiture upon the occasion of Brown's arrest on September 15.

*Discussion*

■■■ The applicable legal principles in forfeiture cases are by now well established. The Government is entitled to initiate a forfeiture proceeding under § 881 if it had "probable cause" to believe that the car was being used in the manner or for a purpose specified by the statute. *United States v. One 1975 Lincoln Continental*, 72 F.R.D. 535, 540 (S.D.N.Y.1976). Once the Government has established probable

cause for seizure of the vehicle, the burden falls upon the claimant to show that the vehicle should be absolved from culpability, or establish that forfeiture is not properly within the forfeiture statute. *United States v. One 1976 Lincoln Mark IV*, 462 F.Supp. 1383, 1388 (W.D.Pa.1979). The innocence of the vehicle's owner—that is to say, his or her lack of involvement in the illegal transaction—does not by itself prevent forfeiture. *One 1976 Lincoln Mark IV, supra*, at 1387; *United States v. One 1978 Chrysler LeBaron*, 531 F.Supp. 32, 34 (E.D.N.Y.1981). That is because the basic nature of a forfeiture proceeding is *in rem*, reflecting the legal fiction that the vehicle itself is guilty of facilitating crime. *One 1976 Lincoln Mark IV, supra*, at 1388.

■ In the case at bar, undercover DEA agents observed Brown and Barnett drive up in the Mercedes. Agent Mercado entered the Mercedes and received from the targets of the investigation cash to be used in consummating a drug purchase. This clearly establishes probable cause in respect of the use being made of the Mercedes. Claimant does not really contend otherwise.

The case therefore turns upon whether or not claimant has sustained his burden of demonstrating a basis upon which forfeiture should be avoided.

Staton makes two basic arguments. In the first he claims a statutory exception; in the second he asserts a constitutional claim. I discuss these in order.

### (a) *Statutory Exception*

Staton relies upon 21 U.S.C. § 881(a)(4)(B), which provides that:

"no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States, or of any State."

It is the case for claimant that Brown's possession and use of the Mercedes violated several provisions of the New York State Penal Law, thereby entitling him to the protection of this provision of the forfeiture statute.

Staton's brief (at 8) prefaces its discussion of the New York statutes with these observations:

"An important factor in determining the legality of Brown's possession of the Mercedes-Benz is the fact that Brewington lent the car to Brown. Brewington had no authority to make such a 'loan' of Staton's property to Brown and Brown knew that."

Preliminarily, it is necessary to note that counsel's assertions are either inadequately supported by the record, or are contrary to the facts as I have found them. Brown did not state categorically that he knew Brewington had no authority to loan the Mercedes to Brown. Brown said only that he assumed Staton did not approve the loan, because Staton was not in town at the time. That is not the same proposition. Nor, apart from Brown's qualified disclaimer (which I do not credit),[1] is there any basis in the evidence to infer doubt on his part with respect to Brewington's authority. Brown knew that Staton has left the Mercedes in Brewington's care for over a year, as of the time of this incident. Furthermore, Brewington acknowledges that he had previously loaned the car to Brown and to members of Brown's family. I find, contrary to counsel's assertion, that Brown had no reason to doubt Brewington's authority to lend him the Mercedes, and that in fact Brown believed Brewington had such authority.

I have also found that, at the time he left his car in Brewington's care, Staton did not forbid Brewington from making the sort of loan (apparently to a mutual acquaintance) with which we are concerned in this case.

These findings and conclusions impact upon claimant's appeal to various provi-

---

**1.** I am skeptical of Brown's testimony on this point because of his natural regret at being the cause of the Mercedes' forfeiture, and an equal-

ly natural antipathy to the Government agents who seek by this action to retain it.

sions of the New York State criminal statutes, to which I now turn.

■ First, Staton contends that Brewington's loan of the car to Brown constitutes the crime of larceny on Brewington's part under New York Penal Law §§ 155.-05(1) and 155.05(2). Section 155.05 defines the crime of "larceny," in pertinent part, as follows:

"1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.

"2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:

"(a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses; ..."

Staton argues that "Brewington, without the consent of Staton, took Staton's property and appropriated it to Brown." Brief at 9. This is said to constitute larceny by misappropriation under § 155.05(1), and larceny by embezzlement under § 155.05(2). The difficulty with the argument is that I have rejected the factual predicate.

■ Staton offers a somewhat different indictment of Brewington's behavior when he argues (brief at 10) that "Brewington's loan of the defendant vehicle to Brown was an unlawful misapplication of property in violation of Penal Law § 165.00(1)." That section provides:

"1. A person is guilty of misapplication of property when, knowingly possessing personal property of another pursuant to an agreement that the same will be returned to the owner at a future time, he loans, leases, pledges, pawns or otherwise encumbers such property without the consent of the owner thereof in such manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss."

Staton argues that Brewington's "unauthorized loan" of a valuable car to a person of Brown's doubtful character recklessly created a risk of inability to recover the car or pecuniary loss, thereby giving rise to a criminal violation on Brewington's part. As stated previously, I do not accept claimant's contention that the loan was "unauthorized." I am not certain that such a characterization is essential to the operation of § 165.00(1), although neither counsel or I have found any New York cases construing the statute. I am of the view, however, that the statute contemplates a long-term encumbrance of the property on the part of the person in possession of it, different in character and risk from the short-term loan in which Brewington indulged Brown.

■ There is an alternative basis for rejecting Staton's appeal to the statutory exception, insofar as that appeal focuses upon the acts and state of mind of Brewington. Within the context of the acts resulting in forfeiture of the Mercedes, the person in possession of the vehicle, the "user" whose acts subjected the vehicle to forfeiture, was Brown, not Brewington. In consequence, it is the legality of Brown's possession and use of the vehicle, not that of Brewington, which determines the applicability of the statutory exception. And as Judge McLaughlin said, construing 21 U.S.C. § 881(a)(4)(B) in *One 1978 Chrysler LeBaron, supra,* at 34:

"For an owner to sustain a defense to a forfeiture action based on unauthorized use of the vehicle, however, he has to establish not only that the user was in possession of the vehicle unlawfully, but in addition, he must show that the user acquired possession of the vehicle by a criminal act. *U.S. v. One Ford Truck Serial No. F25HRJ82180,* 346 F.Supp. 613 (S.D.Cal.1972). *See also United States v. One 1950 Burger Yacht, Florida Registration # FL5163BE,* 395 F.Supp. 802 (S.D.Fla.1975)."

Staton argues that these requirements of proof should not be applied to a § 881 forfeiture. He seeks to draw a distinction

between forfeitures under 21 U.S.C. § 881 and those under the comparable provisions in 49 U.S.C. § 782, which deal with the forfeiture of carriers transporting contraband articles. The cases cited by Judge McLaughlin in the *LeBaron* case arose under 49 U.S.C. § 782, which provides in pertinent part:

"... no vessel, vehicle, or aircraft shall be forfeited under the provisions of this chapter by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such vessel, vehicle or aircraft was unlawfully in the possession of a person *who acquired possession thereof* in violation of the criminal laws of the United States, or of any State." (emphasis added).

Claimant points out that the italicized phrase in § 782—"who acquired possession thereof"—does not appear in 21 U.S.C. § 881(a)(4)(B). This is said to make a significant difference in statutory construction, so that the exception in § 881(a)(4)(B) is broader and more readily available to a claimant seeking to avoid forfeiture. I do not agree. I read the effect of these particular provisions of the statutes as precisely the same. In my view, the phrase "who acquired possession thereof" in 49 U.S.C. § 782 does no more than render explicit what is implicit in the statute at bar: namely, that the owner of a conveyance, in order to obtain the benefit of the statutory exception, must prove that the possessor or user of the conveyance at the pertinent times acquired the possession which permitted the use by means of a criminal act. That construction arises from the plain wording of both statutes. The phrase in question is essentially redundant. Its inclusion in one statute, and omission from the other, is of no significance. I am cited to no legislative history suggesting that this particular difference in wording reflects a congressional intention that the innocent owners of vehicles be treated more leniently under 21 U.S.C. § 881 than under the earlier statute. Indeed, the Second Circuit has indicated generally that just the reverse is true. In *United States v. One 1974 Cadillac Eldo-*

*rado Sedan*, 548 F.2d 421, 424–25 (2d Cir. 1977), Judge Mulligan observed:

"There is therefore reason to give the forfeiture provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 broader coverage than those of other statutes...."

Judge Mulligan was drawing a distinction between 21 U.S.C. § 881 and 49 U.S.C. § 782, his clear indication being that the former statute should be construed more strictly against the owner of the forfeited property than the latter.

■ Accordingly I focus upon Brown. The question is whether or not Staton has shown that Brown, as user in possession of the Mercedes at the time of the drug transaction, had acquired that possession by a criminal act.

Because I have found that Brown had no reason to believe Brewington lacked authority to lend the Mercedes to him, Brown's initial acquisition of possession cannot be characterized as larcenous under any of the New York Penal Law provisions upon which Staton relies. That finding is also fatal to Staton's reliance upon § 165.-05(1), which defines the misdemeanor of "unauthorized use of a vehicle in the third degree." A person commits that crime when he uses a vehicle "[k]nowing that he does not have the consent of the owner ...." In the case at bar, that knowledge is lacking because Brewington was clad in apparent authority to lend the car to Brown.

■ Alternatively, Staton focuses upon the use Brown made of the Mercedes after he acquired possession. Brown is said to have violated § 165.08, which provides:

"A person is guilty of unauthorized use of a vehicle in the first degree when knowing that he does not have the consent of the owner, he takes, operates, exercises control over, rides in or otherwise uses a vehicle with the intent to use the same in the course of or the commission of a class A, class B, class C or class D felony or in the immediate flight therefrom. A person who engages in any

such conduct without the consent of the owner is presumed to know he does not have such consent."

I accept Staton's submission that Brown's use of the Mercedes to facilitate a drug transaction (a felony of sufficient severity to trigger the statute) took place without Staton's consent. Brown was, therefore, guilty of "unauthorized use" of the vehicle as proscribed in § 165.08. But that is not sufficient to avoid forfeiture under the federal statute. As noted *supra*, the innocence of the owner does not shield the vehicle from confiscation. See also *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 688, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974); *United States v. One 1974 Cadillac Eldorado Sedan, supra,* at 424–25. If I were to construe violation of a state criminal statute such as § 165.08 as falling within the statutory exception to forfeiture provided by 21 U.S.C. § 881(a)(4)(B), I would in effect be abrogating that settled rule of federal law. Precisely because federal law condemns the criminally used vehicle even though its owner was innocent of crime, the statutory exception to forfeiture requires the owner to show that the initial acquisition of possession by the criminal actor must be traced to a criminal act. In consequence, criminal statutes such as § 165.08, which focus solely upon the use made of the property by its temporary possessor, do not satisfy the federal statutory exception. For the same reason, Staton's reliance upon P.L. § 145.25 is misplaced. That section of the penal law provides that a person is guilty of the misdemeanor of "reckless endangerment of property" "when he reck-lessly engages in conduct which creates a substantial risk of damage to the property of another person ..."

 Finally, Staton focuses upon Brown's intentional retention of the Mercedes beyond the time that he promised Brewington it would be returned. This is said to violate § 165.05(3), which provides that a person is guilty of a misdemeanor of unauthorized use of a vehicle when:

"Having custody of a vehicle pursuant to an agreement with the owner thereof whereby such vehicle is to be returned to the owner at a specified time, he intentionally retains or withholds possession thereof, without the consent of the owner, for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement.

"For purposes of this section 'a gross deviation from the agreement' shall consist of, but not be limited to, circumstances wherein a person who having had custody of a vehicle for a period of fifteen days or less pursuant to a written agreement retains possession of such vehicle for at least seven days beyond the period specified in the agreement and continues such possession for a period of more than two days after service or refusal of attempted service of a notice in person or by certified mail at an address indicated in the agreement stating (i) the date and time at which the vehicle was to have been returned under the agreement; (ii) that the owner does not consent to the continued withholding or retaining of such vehicle and demands its return; and that continued withholding or retaining of the vehicle may constitute a class A misdemeanor punishable by a fine of up to one thousand dollars or by a sentence to a term of imprisonment for a period of up to one year or by both such fine and imprisonment."

This statute simply does not apply to the facts of the case at bar. As the Supplementary Practice Commentary makes clear, 39 McKinney's Consol. Laws of N.Y. (1984 pocket part) at 80, the purpose of this section of the penal law is to punish commercial car renters who keep the car longer than the written agreement provides for. The Commentary recites: "After many years of trying, the car rental industry has succeeded in getting approval of a bill that will subject short-term car renters to criminal liability for failure to return a rental car on time." The second paragraph of the quoted statute was adopted to give a more specific definition of the term "gross deviation from the agreement," the first paragraph standing alone being regarded by the industry as too vague to permit effective enforcement. In short, the New York

Legislature was addressing an entirely different issue. I decline to hold that this statute may be availed of by Staton to characterize Brown's acquisition of the Mercedes as criminal within the context of the drug forfeiture statute.

For the foregoing reasons, Staton is not entitled to the statutory exception from forfeiture of his car.

### (b) *Constitutional Claim*

Staton's constitutional claim, grounded in concepts of due process, arises out of *dicta* taken from the Supreme Court's decision in *Calero-Toledo v. Pearson Yacht Leasing Co., supra.*

It is not surprising that Staton relies on *dicta* found in *Calero-Toledo.* The holding of the case could not be worse for him. The facts of the case were that a yacht leasing company leased a pleasure yacht to two Puerto Rican residents. Thereafter Puerto Rican authorities discovered marijuana on board the yacht. They subjected the yacht to forfeiture pursuant to a Puerto Rican statute comparable to the one at bar. The leasing company was neither involved in nor aware of the act of the lessee which resulted in the forfeiture. In these circumstances, the leasing company argued that "the forfeiture statutes unconstitutionally authorized the taking for government use of innocent parties' property without just compensation." 416 U.S. at 680, 94 S.Ct. at 2090. The Supreme Court squarely rejected that argument, reversing a three judge panel which had accepted it. *Calero-Toledo* observed that "a long line of prior decisions of this Court established the principle that statutory forfeiture schemes are not rendered unconstitutional because of their applicability to the property interests of innocents," and held that *United States v. United States Coin & Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), upon which the court below primarily relied, did not "overrule those prior precedents *sub silentio.*" *Ibid.* After reviewing that line of authority, the Court observed: "To the extent that such forfeiture provisions are applied to lessors, bailors, or secured creditors who are innocent of any wrongdoing, confiscation may have

the desirable effect of inducing them to exercise greater care in transferring possession of their property." *Id.,* 416 U.S. at 687–88, 94 S.Ct. at 2094.

Having said all that, the Court came towards the end of its opinion, *id.* at 688–90, 94 S.Ct. at 2094–95, to the *dicta* upon which the present claimant relies. The Court said:

"This is not to say, however, that the 'broad sweep' of forfeiture statutes remarked in *Coin & Currency* could not, in other circumstances, give rise to serious constitutional questions. Mr. Chief Justice Marshall intimated as much over a century and a half ago in observing that 'a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed.' *Peisch v. Ware,* 4 [ (8 U.S.) ] Cranch 347, 363 [2 L.Ed. 643] (1808). It therefore has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. See, *id.,* at 364; *Goldsmith-Grant Co. v. United States,* 254 U.S. [505] at 512 [41 S.Ct. 189 at 191, 65 L.Ed. 376 (1921) ]; *Van Oster v. Kansas,* 272 U.S. [465] at 467 [47 S.Ct. 133, at 134, 71 L.Ed. 354 (1926) ]. Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for, in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive. Cf. *Armstrong v. United States,* 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554] (1960)." (footnotes omitted).

However, the *Calero-Toledo* opinion concludes with this paragraph:

"But in this case appellee voluntarily entrusted the lessees with possession of the yacht, and no allegation has been made or proof offered that the company did all that it reasonably could to avoid having its property put to an unlawful use. Cf.

*Goldblatt v. Town of Hempstead,* 369 U.S. 590, 596 [82 S.Ct. 987, 991, 8 L.Ed.2d 130] (1962). *Id.* at 690, 94 S.Ct. at 2095.

The Court upheld forfeiture of the yacht.

*Calero-Toledo* may thus be read for the proposition that a constitutional impediment to forfeiture arises if the property owner is (a) entirely innocent of the underlying crime and (b) did "all that reasonably could be expected to prevent the proscribed use of his property." The claimant bears the burden on both these issues. In the case at bar, Staton has clearly demonstrated his innocence of the drug transaction of which Brown was involved. But has he satisfied the second prong of the constitutional test? Quite clearly, the innocence of Staton's authorization to Brewington to drive the car is not sufficient. The yacht leasing company in *Calero-Toledo* was no less innocent than Staton of the user's intentions. The second prong clearly calls for some affirmative preventive action. As in all cases where actions are judged by the standard of reasonableness, the particular circumstances must be considered.

■ I conclude that Staton has not proved that he "did all that [he] reasonably could to avoid having [his] property put to an unlawful use." *Calero-Toledo* at 690, 94 S.Ct. at 2095. Surely Staton did not do all that he physically could. Unlike the yacht leasing company in *Calero-Toledo,* whose business it was to place its vessels in the hands of lessees, Staton did not have to leave his brand new Mercedes (for which he had paid $40,000 several months before) in Brewington's hands. He could have left the car in a commercial garage and denied its access to anyone. Given the expected duration of Staton's absence from New York, the car could have been placed in dead storage to minimize the expense. Instead, Staton left the car in Brewington's care and control, and gave him permission to drive it. Staton knew that Brewington was a parolee, and that he frequented social clubs where the consumption of illegal narcotics was part of the life style. I do not denigrate Brewington's apparent rehabilitation from his prior narcotics conviction; and I reiterate that there is no evidence that Staton or Brewington were drug users themselves at the pertinent times. In my judgment, however, of these two particular options, garaging the car constituted the one which Staton reasonably should have exercised to avoid possible unlawful use.

Assuming that garaging was not reasonably required, in contrast to a loan of the car to Brewington, at the very least Staton should have exercised maximum efforts to see that no one else drove the car. On this issue his proof is entirely deficient. As noted *supra,* there is no proof of any occasion upon which Brewington was directly and specifically instructed not to let others use the car. Nor did Staton execute any document to that effect, although it would have been easy to do so. For example, the notice identifying Brewington as an authorized driver of the car could also have stated that no one else had such authority. Brewington's practice of frequently lending the car to others is inconsistent with instructions from his employer and benefactor that he not do so. Of course, it is possible that such instructions were given and Brewington chose to disregard them; but given the relationship between the two men, I consider this unlikely, and in any event Staton has the burden of proof on the issue.

Those cases which exempt a vehicle from forfeiture stress the importance of the owner's explicit prohibitions which were violated at the time of the criminal act. See, *e.g., United States v. One 1971 Ford Truck,* 346 F.Supp. 613, 620 (C.D.Cal.1972) (owner of vehicle testified "that his explicit instructions to his son were that he should only use the truck for this limited task and that he should return the truck to the father's residence immediately upon its completion," coupled with instructions to his son "not to use the truck at any other time or for any other purpose"); *United States v. One 1954 "98" Oldsmobile Convertible,* 152 F.Supp. 616, 618 (M.D.Pa.1957) ("... there was a lot of uncontradicted testimony to the effect that immediately upon being advised that her son was dealing in narcotics she forbade him using the car, and that this injunction was made on a number of

occasions."). By way of contrast, forfeiture was decreed in *United States v. One 1971 Chevrolet Corvette*, 393 F.Supp. 344, 348 (E.D.Pa.1975), a post-*Calero-Toledo* case, in which Judge Luongo applied its requirement of reasonable prevention and wrote:

"Arguing from the dictum in *Pearson*, claimants contend that Mrs. Fisher was the innocent owner of the vehicle, uninvolved in and unaware of her husband's criminal activity, and that she had done all that could reasonably be expected to prevent illegal use of her property. Setting aside for the moment the question of title ownership to the vehicle, it is clear that Mrs. Fisher did not take all steps that could reasonably be expected to prevent her husband from using the vehicle for illicit purposes. Her testimony was that she did permit her husband to use the vehicle and that she even gave him a set of keys for his use. In light of the husband's criminal background, this would have been enough to warrant forfeiture of her vehicle. To that must be added, in this case, the fact that Mrs. Fisher voluntarily titled the vehicle in the names of both as tenants by the entireties. With this title ownership, under Pennsylvania law, under which each tenant by the entireties owns the whole, and each has the right to possess, use and enjoy the property so owned, *Madden v. Gosztonyi S. & T. Co., supra*, 331 Pa. [476] at 482, 200 A. 624 [ (1938) ], it is at least questionable that Mrs. Fisher had the power to restrict her husband's use of the vehicle."

The other case upon which Staton relies is *United States v. One 1976 Lincoln Mark IV*, 462 F.Supp. 1383 (W.D.Pa.1979). The owner of the car loaned it to his brother-in-law. The owner knew that the brother-in-law had been convicted of a securities violation four years earlier and had served time for the offense. However, the owner testified that he had no knowledge that the brother-in-law was involved with drugs. The car was forfeited when the brother-in-law was arrested in connection with a drug transaction in which the car had been used. Judge Cohill, undertaking to apply the *Ca-*

*lero-Toledo* standard, concluded that the owner had done all that could reasonably be expected of him to prevent illegal use of his car, although acknowledging "the case before us to be a close one, and that [i]t would be possible to reach an opposite conclusion here, citing reputable authority." 462 F.Supp. at 1391–92.

I agree with claimant that this case bears an arguable resemblance to the case at bar; but with respect, I regard Judge Cohill's analysis and decision as outside the mainstream of authority in this area.

Regarding the case at bar in the totality of its circumstances, I conclude that claimant Staton has not sustained his burden of proof on the issue of sufficient action to prevent illegal use of his car.

### CONCLUSION

The Clerk of the Court is directed to enter an order forfeiting the vehicle in suit to the United States. In my discretion, I direct that each party bear its own costs.

It is SO ORDERED.