**MANUFACTURAS INTERNATIONAL, LTDA, Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST CO., Defendant.**

**ABUCHAIBE HNOS. LTDA, Plaintiff,**

v.

**BANCO ATLANTICO S.A., Defendant.**

**COMERCIAL SAMORA, Plaintiff,**

v.

**BANCO ATLANTICO S.A., Defendant.**

**CREACIONES VIVIANA, Plaintiff,**

v.

**BANCO ATLANTICO S.A., Defendant.**

**Nelson GOMEZ–COSTAFAST, and Nelson Gomez–Faster, Plaintiffs,**

v.

**BANK OF NEW YORK, Defendant.**

**CREACIONES VIVIANA, LTDA, Plaintiff,**

v.

**BANCO ATLANTICO S.A., Defendant.**

**COMERCIAL ESTRELLA LTDA, Plaintiff,**

v.

**BANK OF NEW YORK, Defendant.**

**CONFECCIONES Y TEJIDOS NACIONALES LTDA, Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST CO., Defendant.**

**MANUFACTURERA DEL ATLANTICO LTDA, Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST CO., Defendant.**

INDUSTRIAS MARATHON
LTDA, Plaintiff,

v.

MANUFACTURERS HANOVER
TRUST CO., Defendant.

No. CV 91–4536 (JBW).

United States District Court,
E.D. New York.

Feb. 27, 1992.

Isidoro Rodriguez, Barranquilla, Colombia, for plaintiffs.

Mark S. Sullivan, Townley & Updike, New York City, for Banco Atlantico.

Anne T. Schwab, Michael D. Povman, Office of Gen. Counsel, Bank of New York, New York City, for the Bank of N.Y.

Maureen K. Stein, Mfrs. Hanover Trust Co., Office of Gen. Counsel, New York City, for Mfrs. Hanover Trust Co.

## MEMORANDUM AND ORDER.

WEINSTEIN, District Judge.

In ancient times, the dagger used to stab a person to death was forfeited to the Crown—a practice having both legal and religious significance. 2 Sir Frederick Pollock & Frederic W. Maitland, *The History*

*of English Law* 473–74 (2d ed. 1968); *Exodus* 21:29. Recently this concept of the deodand has been extended to permit the government to seize the profits of narcotics traffickers. *See* 21 U.S.C. § 881 *et seq.* (1988 & Supp. III 1991), and 18 U.S.C. § 981 *et seq.* (1988 & Supp. III 1991). Expanding an archaic concept from a simpler society to fit our complex technology creates the interesting legal tensions reflected in these proceedings. Yet, the essential ancient and modern theory that forfeiture occurs simultaneously with the tainting of the object by the crime applies and requires dismissal of these *Bank Cases. See* 18 U.S.C. § 981(b); 21 U.S.C. § 881(h).

Modern forfeiture cases continue to reflect the legal fiction that it is the property which has committed a wrong. *United States v. One Mercedes–Benz 380 SEL VIN # WDBCA 33A1BB10331,* 604 F.Supp. 1307, 1312 (S.D.N.Y.1984) ("the vehicle itself is guilty of facilitating crime"), *aff'd,* 762 F.2d 991 (2d Cir.1985). As in the distant past, the accused instrument is instantaneously the property of the government when it becomes tainted with the heinous crime—here, drug trafficking. 21 U.S.C. § 811(h) (1988 & Supp. III 1991) ("All right, title, and interest in property [seized] ... shall vest in the United States upon commission of the act giving rise to forfeiture under this section."); *see* cases cited *infra* Part III. The government, as putative owner of allegedly guilty funds, is entitled to take appropriate steps to locate the property and take it into custody. *Cf.* 21 U.S.C. § 881(c) (1988 & Supp. III 1991) ("Property taken or detained ... shall be deemed to be in the custody of the Attorney General, subject only to the orders and decrees of the court or the official having jurisdiction thereof.").

As part of a suspected drug money-laundering operation, large amounts of funds were being electronically transferred from Europe to South America via New York banks. The banks cooperated with government requests, subpoenas, and court orders by stopping transmission and turning the funds over to the court. The claimants to the funds—primarily Colombian business concerns—sue the banks in these *Bank Cases* for loss of the use of their funds and other claimed violations.

The banks move to dismiss. Their argument is elementary and correct: those who assist the government are not liable to those who claim ownership of what the government contends is already forfeited by the taint of drug trafficking. Faced with competing claims to the same funds, the banks followed instructions and took the sensible step of paying the moneys into court in a form of interpleader. Even if after adjudication it is determined that the funds are not tainted, no fault can be attributed to the banks.

## I. FACTS

The electronic funds transfers at issue were seized based on complaints in *United States v. All Funds on Deposit at Merrill Lynch, Pierce, Fenner & Smith, Inc.,* CV 90–2510 (*All Funds*). These funds are alleged by the government to be the proceeds of illegal narcotics transactions forfeited under 21 U.S.C. § 881 *et seq.* (1988 & Supp. III 1991), and 18 U.S.C. § 981 *et seq.* (1988 & Supp. III 1991). The instant parallel private actions against Manufacturers Hanover Trust, Banco Atlantico, and the Bank of New York are consolidated as the *Bank Cases.*

The first government document to mention these plaintiffs was the Third Amended *All Funds* Complaint filed July 18, 1990, with its accompanying Supplemental Warrant for Arrest of Articles in Rem issued pursuant to Rule C(3) of the Supplementary Rules for Certain Admiralty and Maritime Claims. An individual named José Santacruz–Londono and others working with him had allegedly "conducted extensive narcotics trafficking and money-laundering enterprises, involving millions of dollars and multi-kilograms of cocaine smuggled into the United States and distributed, in part, in the New York metropolitan area."

Santacruz–Londono is said to hold a high position in the Cali drug cartel of Colombia. In 1985, he was indicted in the Eastern District of New York for conspiring to distribute cocaine, distributing cocaine, and

operating a continuing criminal enterprise. He is a fugitive.

The complaint alleged that in connection with Santacruz–Londono's narcotics trade, substantial sums of money have been deposited in, withdrawn from, and transferred to and from accounts located in the United States, including the defendant accounts, and other accounts located in Europe, Panama, and Colombia.

During the month of June 1990, three individuals believed to be connected with the Santacruz–Londono organization had been observed meeting and depositing large sums in accounts at the following places and times:

| | |
|---|---|
| June 11 | Bologna, Italy |
| June 12–18 | Portofino, Italy; Luxembourg City; Brussels; Copenhagen |
| June 19 | Stockholm |
| June 20 | East Berlin and West Berlin |
| June 21 | Amsterdam |

On June 29, 1990, two of the alleged Londono compatriots were arrested on money-laundering charges. A flurry of wire transfer activity followed these arrests.

On July 12, 1990, the Eastern District of New York issued an International Letter Rogatory to the Federal Republic of Germany on information that Santacruz–Londono and others had imported and distributed cocaine in the United States and conspired to disguise the sources and ownership of the proceeds. The government claimed that the Santacruz–Londono organization was importing approximately 3,000 kilograms of cocaine a month into the United States.

A district judge of this court signed the Letter Rogatory and subsequent arrest warrants. The banks which are defendants in these *Bank Cases* were instructed in the Supplemental Warrants for Arrest of Articles in Rem accompanying the Third through Seventh Amended Complaints filed July 18 through August 3, 1990 to attach all funds on deposit in the name of various named individuals and entities and "all related entities and individuals." The United States Attorney also requested by telephone that the banks inform him of all electronic funds transfers received for third-party beneficiaries, only some of whom were named.

From the third week of July through the month of August 1990, the banks faxed copies of each transaction to the United States Attorney, who then instructed the banks whether the beneficiaries were "related entities or individuals" and whether the transfers should be attached. The same or the next day the bank would get official notification to seize. Each of the successive Amended Complaints in *All Funds* named more beneficiaries as their identities became known.

There are now twenty-three claimants in *All Funds*, ten of whom are plaintiffs in these *Bank Cases*. None of the plaintiffs in the *Bank Cases* maintained accounts at the defendant banks. Rather, the plaintiffs were customers of Colombian banks that maintained correspondent banking relationships with the defendant banks. The defendant banks were intermediary banks between the European originating banks and the Colombian receiving banks.

To effect the wire transfers, the defendant banks were supposed to credit the Colombian banks' correspondent accounts. In turn, the Colombian banks were to advise the beneficiaries of the credits. Instead, the defendant banks complied with the requests of the United States Attorney and the instructions of the court and seized the funds on deposit and the wire transfers.

On July 24, 1990, a show cause order presented by the government why the funds should not be paid into court was not opposed by the claimants. The court on July 30, 1990 ordered the banks to pay all attached funds into court. The order also instructed that funds submitted to the court should be accompanied by identifying information such as the beneficiary and the ordering party. During August 1990, the banks complied, and the seized funds were transmitted to the Clerk of the Court of this district. The funds are being maintained in an interest-bearing account pending the outcome of the *All Funds* trial set to begin on March 9, 1992.

On March 26, 1991, the *All Funds* claimants moved for summary judgment and to dismiss the government's complaint on the ground that the government lacked probable cause to seize the funds, that wire transfers are not a res, and that the funds were seized without a warrant. On April 12, 1991, this court denied the motions to dismiss and for summary judgment. The case was remanded to a Magistrate Judge for a decision on whether there was probable cause to seize the funds as proceeds of narcotics trafficking and money-laundering. A supplemental hearing before the court was to be scheduled in the event that the Magistrate Judge found probable cause.

After a hearing, the Magistrate Judge found that the government had probable cause to seize the funds. On May 28 and 29 and June 6, 1991, a district judge also held a hearing on the probable cause issue. On June 13, 1991 this court issued an order finding that, based on the documentary evidence and the testimony of witnesses and experts, probable cause existed to believe that all the funds seized by the government and the subject of the verified claims are subject to forfeiture, except one Merrill Lynch account in the name of Jaime and Cecilia Vargas in the amount of $8,542.35. That small amount was released. The subject funds of the June 13 order were those on deposit in certain identified accounts and the wire transfers at issue in these *Bank Cases.*

The *Bank Cases* were then pending in the district court for the Southern District of New York. On October 30, 1991, that court transferred the consolidated *Bank Cases* to the Eastern District of New York on the grounds that the cases were legally and factually related to *United States v. All Funds. See* 28 U.S.C. § 1404(a) (1988). In the *Bank Cases,* plaintiffs argue that the banks violated several federal statutes by seizing the funds: the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.,* the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* (as amended by the Electronic Communications Privacy Act of 1986), the Federal Reserve Act, 12 U.S.C. § 464 *et seq.,* and the For-

eign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.* In addition, plaintiffs have several state law claims based on the right to privacy, article 4A of the Uniform Commercial Code, conversion, breach of a third-party contract, and gross and ordinary negligence. None of these federal or state claims has merit.

## II. FORFEITURE PROCEEDINGS

Under the forfeiture statutes, 21 U.S.C. § 881 *et seq.* (1988 & Supp. III 1991), and 18 U.S.C. § 981 *et seq.* (1988 & Supp. III 1991), the government may seize any funds and objects of value furnished or intended to be furnished in exchange for a controlled substance. In addition, the government may seek forfeiture of all objects or funds traceable to or intended to facilitate such exchanges. Congress intended that forfeiture be "a powerful weapon in the war on drugs." *United States v. 141st Street Corp.,* 911 F.2d 870, 878 (2d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).

No procedural rules specifically apply to forfeiture actions. Instead, the government applies rules borrowed from the customs laws and from admiralty and maritime law. One court has suggested that the application of these rules to forfeiture actions has created "a procedural morass—a morass in which the parties ... bec[o]me hopelessly entangled." *United States v. $38,000 in United States Currency,* 816 F.2d 1538, 1540 (11th Cir.1987). *See generally* George C. Pratt & William B. Petersen, *Civil Forfeiture in the Second Circuit,* 65 St. John's L.Rev. 653 (1991). This is somewhat of an exaggeration. Judicious use of available procedures and substantive law has permitted the courts to protect the rights of all concerned.

The present case combines the civil forfeiture laws with another area of law which has evolved with little regulation: the law of electronic funds transfers. Although electronic funds transfers account for the movement of hundreds of trillions of dollars, few regulations govern the field. *See generally* Rainer Stockmann, *Liability of Intermediary and Beneficiary Banks*

*in Funds Transfer: A Comparative Study of American and German Law,* 8 Int'l Tax & Bus.Law. 215, 217 (1991); Jeffrey S. Tallackson & Norma Vallejo, *International Commercial Wire Transfers: The Lack of Standards,* 11 N.C.J. Int'l L. & Com.Reg. 639, 639 n. 1 (1986). As two commentators have noted:

> Despite [the] ubiquity [of such transactions] in domestic and international banking as well as the susceptibility of such systems to error and fraud, wire transfer systems have evolved virtually immune from any legislative regulation of the parties' rights and duties. No coherent body of law governs this area.

*Id.* at 639–40.

To understand the facts of this case, some background in the mechanics of wire transfers is necessary. The following brief description of one kind of funds transfer system is borrowed from *Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047, 1049 n. 1 (2d Cir.1979) (description reprinted from district court opinion, 464 F.Supp. 989, 992 n. 5 (S.D.N.Y.1979)).

## III. MECHANICS OF ELECTRONIC FUNDS TRANSFERS

An electronic funds transfer begins with the sending bank. It normally receives a telex from the bank, individual, or corporate entity that is originating the transaction, instructing the sending bank to send funds. The sending bank tests and verifies the telex before transmitting the request, with all the identifying information, from its local computer operator to a central computer network. The central computer for the transfer system stores the information and causes a sending message to be automatically printed at the sending bank.

The sending bank, having determined that payment is appropriate, returns the sending message to its local computer operator to reinsert the message into the computer and press a release key. When the central computer receives this message, it causes the simultaneous printing of a debit ticket at the sending bank and a credit ticket at the receiving bank. The central computer creates a permanent record of the transaction and adjusts the accounts of the sending and receiving banks. These steps are almost instantaneous.

■ Once the receiving bank has received the credit ticket, the individual or corporate beneficiary of the transfer is notified and the funds are made available to the recipient—generally the same day. The funds transfer is considered completed at the moment the receiving bank receives the credit message, not when the beneficiary acquires the funds. *See generally* Richard M. Gottlieb, *Payment, Settlement, and Finality,* in *UCC Article 4-A, A Practical Guide for Bankers and Bank Counsel* (Am. Bankers Ass'n 1991) [hereinafter *Bankers Guide* ].

The receiving bank may be acting as an intermediary bank for a third bank, such as an overseas correspondent bank. If so, another transaction is necessary between the intermediary bank and the correspondent bank. Once the intermediary bank receives the funds, it should credit the account of the correspondent bank. In the instant case the sending banks are in Europe, the intermediary banks are in New York, and the correspondent banks are in Colombia. The funds transfers were seized at the intermediary banks before the funds were credited to the Colombian correspondent banks.

As already indicated, acting on its own investigation, the United States Attorney notified the defendant intermediary banks by telephone that certain electronic funds transfers would be credited to those banks from sending banks. The intermediary banks examined all incoming wire transfers for their correspondent banks in Colombia, notifying the United States Attorney of all transfers designated for the identified beneficiaries. In addition, the banks notified the United States Attorney of other wire transfers to third-party beneficiaries, awaiting notification whether those funds were intended for "related individuals and entities" and should also be seized. Upon instruction from the United States Attorney, the intermediary banks seized the funds and turned them over to the Clerk of the Court for this district.

In the context of a forfeiture proceeding, the plaintiffs have no cause of action against the banks. The property is considered forfeited at the moment the illegal act is committed. 18 U.S.C. § 981(b) (1988 & Supp. III 1991); 21 U.S.C. § 881(h) (1988 & Supp. III 1991). "[T]itle vests absolutely in the sovereign at the date of the illegal act." *United States v. 1314 Whiterock & Improvements, San Antonio, Bexar County, Texas*, 571 F.Supp. 723, 725 (W.D.Tex.1983); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627, 109 S.Ct. 2646, 2653, 105 L.Ed.2d 528 (1989) (vesting at time of illegal act under "taint theory")); *United States v. Trotter*, 912 F.2d 964, 966 & n. 2 (8th Cir.1990) (since government's title in forfeited property relates back to commission of crime, district court could not require fine assessed against defendant to be paid from seized funds); *United States v. Walker*, 900 F.2d 1201, 1204–05 (8th Cir.1990) (forfeiture occurs at time of illegal act even though property may not be seized until later); *In re Metmor Fin., Inc.*, 819 F.2d 446, 449–50 (4th Cir.1987) (since at moment of criminal act original owner no longer owns the property, it is only innocent lienholder who may accrue interest); *United States v. P.O. Box 1303, R.R. No. 2, Pekin, Ill.*, 734 F.Supp. 841, 842 (C.D.Ill.1990) (upon commission of crime United States succeeded to interest which non-innocent owners held as contract buyers, where innocent owners held fee simple subject to a contract for purchase); *United States v. 2511 E. Fairmont Ave., Baltimore, Md.*, 722 F.Supp. 1273, 1279 (D.Md.1989) (since under "relation-back doctrine" of section 881(h) title had vested in the government at time of illegal act, parents could not succeed as heirs or donees of property from their son); *United States v. One Piece of Real Property Located on Trafalgar Street in City of Aiken, S.C.*, 700 F.Supp. 857, 860–61 (D.S.C.1988) (date on government's title relates back to date of crime), *aff'd*, 895 F.2d 987 (4th Cir.1990); *United States v. Real Property Titled in the Name of Shashin, Ltd.*, 680 F.Supp. 332, 335–37 (D.Haw.1987) (describing various courts' treatment of post-seizure interest);

*United States v. Rod & Reel Fish Camp*, 660 F.Supp. 483, 487 (S.D.Miss.) (since forfeiture occurs as of time of criminal act, third parties cannot acquire legal interest in property after that date), *dismissed*, 822 F.2d 57 (5th Cir.), *remanded*, 831 F.2d 566 (5th Cir.1987); *United States v. One Condominium Apartment*, 636 F.Supp. 457, 458 (S.D.Fla.1986) (since title vests in the United States at time of crime, innocent claimants only entitled to their principal and accrued interest up to time of seizure).

More precisely, the forfeiture, which relates back to the time of commission of the illegal act, is then " 'consummated' by a judgment or decree of a court." *Western Pac. Fisheries v. SS President Grant*, 730 F.2d 1280, 1287 (9th Cir.1984) (dicta); *see United States v. 1314 Whiterock & Improvements, San Antonio, Bexar County, Texas*, 571 F.Supp. 723, 725 (W.D.Tex.1983) ("Seizure and a subsequent judicial decree of forfeiture merely confirm the forfeiture that has already taken place."); *United States v. South 23.19 Acres of Land*, 694 F.Supp. 1252, 1254 (E.D.La.1988) (purpose of forfeiture proceeding is "only to perfect th[e] title" as between the government, which succeeded to a one-half interest when husband committed crime, and the wife, who was innocent and owned other half in community property state). *But see United States v. Property Titled in the Name of Alexander Morio Toki & Elizabeth Mila Toki*, 779 F.Supp. 1272 (D.Haw. 1991) (where property held in tenancy by the entirety, at moment of crime innocent wife should succeed to entire property and thus the government succeeds to nothing but is in a position analogous to that of an unsecured judgment creditor of the non-innocent owner spouse). The banks in this case, acting at the direction of the government, seized money which the government considered its own because of the taint of narcotics trafficking.

## IV. FEDERAL STATUTORY CLAIMS

### A. RIGHT TO FINANCIAL PRIVACY ACT

The Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.* (1988) [RFPA], is

designed to protect the confidentiality of financial records from government intrusion. Section 3403(a) provides:

No financial institution, or officer, employees, or agent of a financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter.

12 U.S.C. § 3403(a) (1988 & Supp. III 1991). Only where the customer has given authorization or where the financial institution takes action pursuant to an administrative or judicial subpoena, a search warrant, or certain other enumerated categories of formal requests may the government authorities obtain access to or acquire copies of the records. *Id.* §§ 3402, 3413, 3414.

The RFPA functions as an "express limitation on the authority of government agencies to acquire records of an individual's financial transactions." *Clayton Brokerage Co. v. Clement,* 87 F.R.D. 569, 570 (D.Md.1980). The Act was designed to balance two competing interests: "[the] customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations." *Id.* at 570–71 (citing 1978 U.S.Code Cong. & Admin.News 9273, 9305).

The Right to Financial Privacy Act does not apply here because the complainants are not "customers" within the meaning of the statute. Section 3401 defines a customer as

any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name. . . .

12 U.S.C. § 3401(5) (1988 & Supp. III 1991). The plaintiffs, as beneficiaries of wire transfers, were arguably "utilizing a[ ] service of a financial institution." They did not, however, maintain accounts in their own names at the defendant banks.

Plaintiffs' position is that the RFPA requires that a person have an "account maintained in [his] own name" only when the bank is acting as his fiduciary, but not when the person is utilizing a service of the financial institution. This argument is not persuasive. The commas surrounding the phrase beginning with "or" and ending with "fiduciary" reasonably suggest that a customer must have an account in his own name in both situations. *See Ridgeley v. Merchants State Bank,* 699 F.Supp. 100, 102 (N.D.Tex.1988) ("the Act protects individuals in whose name the financial account is held") (emphasis omitted); *Duncan v. Belcher,* 813 F.2d 1335, 1338–39 (4th Cir.1987) (same).

The RFPA "carefully limits the kinds of customers to whom it applies, and the types of records they may seek to protect." *Securities & Exch. Comm'n v. Jerry T. O'Brien, Inc.,* 467 U.S. 735, 745, 104 S.Ct. 2720, 2727, 81 L.Ed.2d 615 (1984) (citations omitted); *see Spa Flying Serv., Inc. v. United States,* 724 F.2d 95, 96 (8th Cir. 1984) (corporation is not a customer since it is not enumerated in definition of "person" in the Act); *Pittsburgh Nat'l Bank v. United States,* 771 F.2d 73, 76 (3d Cir.1985) (same). Since the beneficiaries did not maintain accounts in their own names, they are not customers within the meaning of the statute even though they arguably "utilized a[ ] service" of the bank.

Because the Act does not apply, we need not decide whether seizure of funds constitutes the transfer to the government of "information" or "financial records." *Cf. United States v. Eighty–Eight (88) Designated Accounts Containing Monies Traceable to Exchs. for Controlled Substances,* 740 F.Supp. 842, 851 & n. 15 (S.D.Fla.1990) (court in seizure case concerned about government's "apparent violation of the RFPA"). Nor is it necessary to decide whether the litigation exception could apply in an in rem proceeding nominally one by the government against the funds—that is, whether the beneficiaries of wire transfers can be considered "parties." *See* 12 U.S.C. § 3413(e) (1988 & Supp. III 1991).

## B. OMNIBUS CRIME CONTROL AND SAFE STREETS ACT

■ Plaintiffs also claim that the banks, in seizing the wire transfers of funds, violated the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* (1988 & Supp. III 1991). That statute was amended in 1986 by the Electronic Communications Privacy Act [ECPA], which was passed on October 21, 1986 and became effective 90 days later. Congress broadened the prior reach of the statute to cover many new developments in technology. The legislative history points out that the amendment is designed to

> update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies.

1986 U.S.Code Cong. & Admin.News 3555, 3555. Before amendment the Act prohibited only the "aural" interception of wire and oral communications and protected only those wire communications sent by common carriers. The impetus for amendment was the need to protect privacy while keeping pace with modern technology, but the amendment may have reduced privacy protection. *See generally* Russell S. Burnside, *The Electronic Communications Privacy Act of 1986: The Challenge of Applying Ambiguous Statutory Language to Intricate Telecommunication Technologies*, 13 Rutgers Computer & Tech.L.J. 451, 494–95 (1987) (1986 Act cured "ambiguities and antiquities of the 1968 Act ... [but] at the expense of privacy protections"); Fred Jay Meyer, *Don't Touch That Dial: Radio Listening Under the Electronic Communications Privacy Act of 1986*, 63 N.Y.U.L.Rev. 416, 434 (1988) (arguing that although the 1986 bill was intended to curb increasing surveillance, it "came to embody the Justice Department's wish list" with concomitant reduced privacy protections); L. Tribe, *The Constitution in Cyberspace: Law and Liberty Beyond the Electronic Frontier*, Keynote Address at the First Conference on Computers, Freedom and Privacy (proposing Constitutional amendment to address conjunction of privacy and technology), *cited in* Robert Garcia, *"Garbage In, Gospel Out": Criminal Discovery, Computer Reliability, and the Constitution*, 38 UCLA L.Rev. 1043 (1991).

The statute as amended now prohibits the interception of "electronic communications" as well as oral and wire communications. It applies to a wide range of new technologies, including electronic mail and bulletin boards, computer-to-computer communications, remote computer services, cellular telephones, portions of cordless telephone communications, pen registers, trap and trace devices, and certain kinds of pagers and satellite transmissions. 1986 U.S.Code Cong. & Admin.News 3555, 3562–65. As pointed out in the legislative history:

> Today we have large-scale electronic mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing. A phone call can be carried by wire, by microwave or fiber optics. It can be transmitted in the form of digitized voice, data or video.

*Id.* at 3556 (citation omitted). An electronic communication is defined as

> any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system. . . .

18 U.S.C. § 2510(12) (1988 & Supp. III 1991). It includes digital and scrambled symbols. *Id.* § 2510(16)(A). Bank-to-bank funds transfers and transmission of financial records were intended to be protected electronic communications under the amended statute. *See* 1986 U.S.Code Cong. & Admin.News 3555, 3562.

Further technological advancements will raise new problems. For example, whereas in earlier days eavesdroppers needed to tap the lines of a computer directly, now they can intercept the electromagnetic radiation emitted by computers and their peripherals, either actively from cables or passively as the radiation moves through the ether. *See* Christopher J. Seline, *Eavesdropping on the Compromising Emanations of Electronic Equipment: The Laws of England and the United States*, 23 Case W.Res.J.Int'l L. 359, 360 & nn. 8–9 (1991);

see also Russell S. Burnside, *The Electronic Communications Privacy Act of 1986: The Challenge of Applying Ambiguous Statutory Language to Intricate Telecommunication Technologies*, 13 Rutgers Computer & Tech.L.J. 451, 497–98 (1987) (certain distinctions the 1986 statute makes among various electronic devices are already obsolescent). It has been suggested that in the twenty-first century specialized hardware and software, connected by wires, radio waves, and infrared, will be so ubiquitous that no one will remark their presence. Mark Weiser, *The Computer for the 21st Century*, in *Scientific American*, at 93 (Sept.1991). Such devices will keep track of individuals and objects, their location and function, without any awareness on the part of subjects that they are being monitored. *Id.*

That the statute was amended to keep pace with technological advancements does not change its purpose and scope. Usually known as the federal wiretap act, the statute was designed by Congress to create a uniform system to govern electronic surveillance. *See* 1968 U.S.Code Cong. & Admin.News 2112, 2153, *cited in United States v. Clemente*, 482 F.Supp. 102, 106 (S.D.N.Y.1979), *aff'd*, 633 F.2d 207 (2d Cir. 1980). The Act "represent[ed] an attempt by Congress to establish a system of electronic surveillance subject to rigorous safeguards." *Clemente*, 482 F.Supp. at 106; *see also United States v. Tortorello*, 480 F.2d 764, 773 (2d Cir.) ("The Act represents an attempt by Congress to establish a limited system of electronic surveillance...."), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

The Eleventh Circuit in *United States v. Herring*, 933 F.2d 932 (11th Cir.1991), in a case interpreting another section of the statute which describes prohibited devices, addressed the question whether the 1986 amendments "changed the nature of the statute." *Id.* at 934. At issue were the convictions of defendants in the district court for selling devices that unscramble satellite pay-television transmissions. Noting that the 1986 amendments simply substituted "intentionally" for "willfully" and added "or electronic" to the list of kinds of communications, the court concluded that the amendments effected no other change in the statute's scope. *Id.* at 934–35; *see also* Christopher J. Seline, *Eavesdropping on the Compromising Emanations of Electronic Equipment: The Laws of England and the United States*, 23 Case W.Res.J. Int'l L. 359, 375 (1991) ("[the 1986] Act did not modify the main concerns of Title III"). The statute continues to be directed at regulating surveillance through prohibiting the interception of the contents of communications by any electronic, mechanical, or other device. 18 U.S.C. § 2510(4) (1988 & Supp. III 1991).

The seizure of electronic funds transfers by banks following government and court instructions in forfeiture proceedings is not within the ambit of the wiretap statute. Forfeiture proceedings are not surveillance. In these *Bank Cases*, since the funds and the transfers were being claimed in good faith as belonging to the government, obtaining information on their destination and taking them into government possession was not a violation of the statute.

There is little doubt that the war on drugs, including the skirmishes around forfeitures, has reduced the law's privacy protections. *See generally United States v. Glover*, 957 F.2d 1004, 1020 (2d Cir.1992) (Oakes, C.J., dissenting) ("One would hope that the war on drugs does not make for a police state."); *United States v. Hooper*, 935 F.2d 484, 500 (2d Cir.) (Pratt, J., dissenting) ("It appears that th[e law enforcement agents] have sacrificed the fourth amendment by detaining 590 innocent people in order to arrest ten who are not—all in the name of the 'war on drugs'. When, pray tell, will it end? Where are we going?"), *cert. denied*, — U.S. —, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); *United States v. Monsanto*, 924 F.2d 1186, 1204 (2d Cir.) (Oakes, C.J., dissenting) (disagreeing with majority's decision in light of "the squeeze already exerted on prosecutorial and judicial resources by the flood of nar-

cotics cases inundating the federal courts"), *cert. denied*, —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *United States v. Riley*, 906 F.2d 841, 850 (2d Cir. 1990) (Weinstein, J., dissenting) ("Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great.") (citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Marshall, J., dissenting)). Nevertheless, there is no warrant in the wiretapping or electronic eavesdropping provisions to protect those claiming forfeited funds. If there is any conflict between the Omnibus Crime Control and Safe Streets Act as amended and the forfeiture statutes, Congress will have to act to provide further protection to claimants.

The wiretap act has no application because funds in forfeiture proceedings are deemed to belong to the government at the time of their criminal use. The statute cannot apply where, as here, the government reasonably viewed the funds as its own. The concept that ownership of the object is transferred instantaneously at the time of criminality provides a conceptual distinction making the laws governing wiretapping and interference with communications irrelevant.

■ Even if the statute applied, the banks would not be subject to liability. As noted above, the 1986 amendments substituted "intentionally" for "willfully." Since the instant funds were already forfeited to the government as a result of their illegal genesis, the government's intent was to seize its own funds. The banks had no independent intention other than to follow the directions of the United States Attorney. The banks should face no liability where they intentionally acted within their perceived legal obligations by following the instructions of the United States Attorney and the court.

■ Moreover, under the statute there is no liability where a party to the transfer intercepts the communication by consent or under color of law:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c) (1988 & Supp. III 1991). No cause of action may be maintained against private actors where they are ordered by government authorities to intercept communications. *See Camacho v. Autoridad de Telefonos*, 868 F.2d 482, 489–90 (1st Cir.1989) (telephone companies entitled to immunity under that section when acting at the direction of federal officers). Nor is there liability for the interception of electronic communications in transit or in electronic storage where one party to the communication consented to access. *See American Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F.Supp. 1473, 1494–95 (D.Mn.1991). The banks, and not the beneficiaries, were parties to the communication and consented to the interception. They acted at the direction of the United States Attorney as to funds the government claimed as its own.

■ Another provision of the statute specifically exempts from liability the providers of an electronic communication service who act at the direction of a court order:

Notwithstanding any other law, providers of wire or electronic communication service, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications ... if [the above enumerated persons have] been provided with—

(A) a court order directing such assistance signed by the authorizing judge....

18 U.S.C. § 2511(2)(a)(ii) (1988 & Supp. III 1991). The banks, as providers of an electronic communication service, are authorized under the statute to assist the law enforcement agents in the interception of communications.

■ Good faith reliance on a court warrant or order is also a complete defense under the statute. 18 U.S.C. § 2520(d)

(1988 & Supp. III 1991); *see also id.* § 2707(d)(1) (same defense for interception of stored electronic communications). These *Bank Cases* are analogous to *Jacobson v. Rose,* 592 F.2d 515 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979), where a telephone company received a court order requesting it to assist county officials with a wiretap. The telephone company asked the officials to redraft the order to ensure that no law was being violated. Similarly, in these *Bank Cases,* the banks received the complaints and warrants and they requested assistance from the United States Attorney to clarify the instructions. One bank employee declared: "we talked to [the United States Attorney] in order to have a clarification of the text of the subpoena."

 The banks, like the telephone company in *Rose,* are protected because of their reasonable belief that they were acting in compliance with a lawfully issued court order. *Rose,* 592 F.2d at 523–24; *see also Smith v. Nixon,* 606 F.2d 1183, 1191 (D.C.Cir.1979) (telephone company's reasonable expectation of legality when acting pursuant to Executive direction prevented any liability for alleged Constitutional or statutory violation), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981); *Citron v. Citron,* 539 F.Supp. 621 (S.D.N.Y.1982), *aff'd,* 722 F.2d 14 (2d Cir. 1983) (same under wiretap statute before amendment), *cert. denied,* 466 U.S. 973, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *Wright v. State of Florida,* 495 F.2d 1086, 1090 (5th Cir.1974) (dicta) (good faith reliance on a court order is a defense under the Fourth Amendment and under the wiretap statute); *cf. Kratz v. Kratz,* 477 F.Supp. 463, 479–80 (E.D.Pa.1979) (dicta) (reasonable reliance on an opinion of a United States Court of Appeals may be proper basis for good faith defense).

It is unnecessary to address the defendants' remaining argument, that they could not have "intercepted" the electronic communications since they were in fact the intended recipients.

## C. FEDERAL RESERVE ACT

 Plaintiffs assert in a conclusory fashion that the seizure of funds violated Regulation J of the Federal Reserve Act, which "governs the collection of checks and other cash and noncash items by Federal Reserve Banks." 12 C.F.R. § 210 *et seq.* (1985). Regulation J was promulgated to "define more precisely the terms and conditions under which the Reserve banks receive and handle for collection [such] items." *Colonial Cadillac, Inc. v. Shawmut Merchants Bank, N.A.,* 488 F.Supp. 283, 284 (D.Mass.1980) (citing 32 C.F.R. § 6210). The provisions of Regulation J serve to "limit liability of a Federal Reserve bank." *Appliance Buyers Credit Corp. v. Prospect Nat'l Bank,* 505 F.Supp. 163, 164 (C.D.Ill.1981) (depositor of a sending bank is not a "sender" as defined in 12 C.F.R. § 210.2(e)), *aff'd,* 708 F.2d 290 (7th Cir.1983); *see also Washington Petroleum & Supply Co. v. Girard Bank,* 629 F.Supp. 1224, 1229–30 (M.D.Pa.1983) (same); *Childs v. Federal Reserve Bank,* 719 F.2d 812, 814 (5th Cir.1983) ("Regulation J . . . enables the federal reserve system to perform its check collection and clearinghouse functions. . . ."); *Colonial Cadillac,* 488 F.Supp. at 285 (remote parties protected). Plaintiffs have failed to prove that the Federal Reserve Act has any application to the seizure of wire transfers by intermediary banks in forfeiture proceedings.

## D. FOREIGN INTELLIGENCE SURVEILLANCE ACT

 The Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.* (1988), relied upon by the plaintiffs, has no bearing on this case. The government and banks were overseeing transfers of what the government considered its own funds.

## V. STATE LAW CLAIMS

### A. NEW YORK RIGHT TO PRIVACY

 Plaintiffs claim that the banks' seizure of wire transfers violated their right to privacy. Whether viewed as a common law cause of action or a state statutory cause of action, plaintiffs' complaint fails to state a claim. There is no common law right to privacy in the State of New York. *See Young v. United States Dep't of Justice,* 882 F.2d 633, 641 (2d Cir.1989), *cert.*

*denied,* 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990) (citing New York cases); *Cohen v. Hallmark Cards,* 45 N.Y.2d 493, 497 n. 2, 410 N.Y.S.2d 282, 382 N.E.2d 1145 (Ct.App.1978). Although there is a statutory right to privacy, it is restricted to "cases involving unauthorized use of person's name or likeness." *Young,* 882 F.2d at 641 (citing N.Y.Civ. Rights Law §§ 50–51).

### B. U.C.C. ARTICLE 4A

■ Article 4A of the Uniform Commercial Code was enacted in the State of New York with an effective date of January 1, 1991. For the first time 4A put into place specific rules for the regulation of funds transfers. It cannot be relied upon in the instant case since the wire transfers were seized in July and August of 1990. The statute does not apply retroactively. *See Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 371, 568 N.Y.S.2d 541, 547, 570 N.E.2d 189, 195 (Ct.App.1991).

■ In any event, section 4A–503 of the U.C.C., entitled "Injunction or Restraining Order With Respect to Funds Transfer," recognizes that banks have an obligation to respond to court orders. *See* Thomas J. Greco, *Miscellaneous Provisions: Creditor Process, Injunction, Finality of Account Statement, and Choice of Law,* in *Bankers Guide, supra,* at 56. The Official Comment states that "intermediary banks are protected," meaning that since the time in transit for funds transfers is brief, intermediary banks cannot be expected to comply with injunctions by creditors. Instead, creditor process should be directed at the originating and receiving banks. The Comment suggests that intermediary banks should not be exposed to liability under article 4A for *declining* to stop funds transfers where creditors are seeking the funds. In the instant case, the opposite situation is presented. Plaintiffs wish to hold the intermediary banks liable for *agreeing* to seize the funds. No such liability is justified. Article 4A was enacted to enable all parties to funds transfers to "predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services accordingly." Official Comment to U.C.C. § 4A–102. The policies of article 4A are served by protecting the intermediary banks in forfeiture cases. The courts should hesitate to provide restrictions on their own powers to act swiftly. *Cf.* Sir Nicolas Browne–Wilkinson, *Territorial Jurisdiction and the New Technologies,* 25 Israel L.Rev. 145, 147 (1991) ("[T]he speed at which modern technology works is ... threatening the roots of justice itself."). Finally, even if the U.C.C. were applicable, under the Supremacy Clause a state could not in its regulation of commercial activity inhibit federal law enforcement agencies in applying federal drug laws.

### C. CONVERSION

■ Plaintiffs allege a cause of action for conversion against the defendant banks. Conversion requires the intentional deprivation of the property of another with intent to retain it permanently. *See In re Di Crocco's Estate,* 170 Misc. 826, 827, 12 N.Y.S.2d 276, 278 (Surr.Ct.1939); *see, e.g., Shawmut Worcester County Bank v. First Am. Bank & Trust,* 731 F.Supp. 57, 59–60 (D.Mass.1990) (conversion claim may be cognizable, but no conversion under the facts of the case where bank refused to reverse wire funds transfer); *cf.* 1 W. Hawkland, F. Leary & R. Alderman, *Conversion by Representatives Including Depositary and Collecting Banks,* U.C.C. Series § 3–419:05 (1982–86).

No conversion by the banks took place. Although the banks did seize the wire transfers of funds, they promptly paid the moneys to the Clerk of the Court for safekeeping during the pendency of the litigation. There was never an intention by the banks to take title for themselves or on behalf of anyone else. *Cf. Bradley v. Roe,* 282 N.Y. 525, 532, 27 N.E.2d 35, 39 (Ct. App.1940) ("placing property in the custody of the court is, it is plain, not an assertion of dominion over the property to the exclusion of the real owner"). In effect, there were two parties contending they owned the funds—the government and the claimants. The banks turned the funds over to the courts. In any event, no claim for conversion is possible in forfeiture proceed-

ings, since the defendant property ceases to belong to the claimant at the moment the crime is committed.

## D. THIRD–PARTY BENEFICIARY

■ Where a contract is formed for the benefit of a third person, that person should have a right of action against a promisee who fails to perform. 2 Samuel Williston, *A Treatise on the Law of Contracts* § 347 *et seq.* (3d ed. 1959). Plaintiffs claim that as third-party beneficiaries of a contract between the banks, they have a cause of action against the banks that failed to turn over the funds.

■ Generally, it is the originator's and not the beneficiary's claims against an intermediary bank which are allowed to stand. *See, e.g., Security Funds Servs. v. American Nat'l Bank & Trust Co.,* 542 F.Supp. 323, 329 (N.D.Ill.1982) (initiator of transfer could be a third-party beneficiary). *But see Worldwide Sugar Co. v. Royal Bank,* 609 F.Supp. 19, 25 (S.D.N.Y.) (no manifest intention to benefit third-party in letter-of-credit arrangement), *aff'd,* 751 F.2d 373 (2d Cir.1984). The plaintiffs here have made no showing that they are not only the beneficiaries but also the originators of the wire transfers.

In a forfeiture proceeding, the claims of plaintiffs as beneficiaries of wire transfers are meaningless. As noted above, at the moment a crime is committed the property ceases to belong to the claimant. If it is determined at trial that the funds are traceable to narcotics trafficking, the money will be declared the property of the government *ab initio.* Then several defenses or excuses would nullify or bar enforcement of the contract. For example, where the subject matter of a contract is illegal, there is no enforceable contract. Where performance is impossible, it is excused. *Cf. United States v. Rod & Reel Fish Camp,* 660 F.Supp. 483, 487 (S.D.Miss.) (third parties cannot acquire legal interest in property after date of illegal act since forfeiture occurs as of that time), *dismissed,* 822 F.2d 57 (5th Cir.), *remanded,* 831 F.2d 566 (5th Cir.1987).

As of this moment, probable cause having been found for the seizure of the funds, the claim of the government, not of the plaintiffs, is the only one appropriate for recognition under the third-party contract rubric.

## E. NEGLIGENCE CLAIMS

■ Like the other causes of action, plaintiffs' negligence and gross negligence causes of action stem from the seizure of wire transfers of funds by the defendant intermediary banks. Courts have upheld negligence actions against banks for failing to effectuate electronic funds transfers. *See, e.g., Bradford Trust Co. v. Texas Am. Bank–Houston,* 790 F.2d 407, 411 (5th Cir. 1986) (negligence claims may stand against bank which honored fund transfer requests of imposter); *Compania Anonima Venezolana de Navegacion v. American Express Int'l Banking Corp.,* 1985 WL 1898, at *5 (S.D.N.Y.1985) (denying summary judgment because of possible negligence of bank in failing to transmit telex); *Security Funds Servs. v. American Nat'l Bank & Trust Co.,* 542 F.Supp. 323, 327 (N.D.Ill. 1982); *Evra Corp. v. Swiss Bank Corp.,* 522 F.Supp. 820, 828–29 (N.D.Ill.1981), *aff'd in part, vacated in part, rev'd in part,* 673 F.2d 951 (7th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982); *Central Coordinates, Inc. v. Morgan Guar. Trust Co.,* 129 Misc.2d 804, 807, 494 N.Y.S.2d 602, 605 (N.Y.Sup.Ct.1985) (negligence claim cognizable, but none found where it was the plaintiff who was in a better position to avoid the consequences of nondelivery of funds or failure to notify of transfer).

■ In negligence actions against the banks, as in the third-party contract actions discussed above, it is the originator of the funds transfer who is permitted to maintain the cause of action. In *Evra,* for example, the district court held that the sending bank was under a duty to exercise ordinary care to ensure that the funds transfer was effected in a proper and timely manner. 522 F.Supp. at 829.

In the instant case, defendants were not rogue banks seizing funds carelessly or without justification. The intermediary banks were following the precise oral and written instructions of the United States Attorney and the court. Even if the banks

can be considered to have a duty to the beneficiaries who were not their customers (a proposition not without controversy), they did not violate the duty of care.

The banks were directed in a showing of apparent authority to seize the funds. *Cf. Clayton Brokerage Co. v. Clement*, 87 F.R.D. 569, 570 (D.Md.1980) (dicta) (bank has no justification for refusing to comply with subpoena issued in civil action). They do not have all the relevant information and cannot make an independent determination of merit.

Moreover, wire transfers occur at such speed, *see Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1049 n. 1 (2d Cir.1979), that the banks could not, even if they wished, take the time to evaluate orders before deciding whether to comply. Courts recognize that, at least vis-à-vis government action, the nature of the property to be seized may justify swift action. *See Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452 (1974); *United States v. 4880 S.E. Dixie Highway*, 612 F.Supp. 1492, 1498 (S.D.Fla.1985) (government may "act first and seek judicial approval later" where movable nature of res suggests exigent circumstances). Where the property is "of a sort that could be removed to another jurisdiction, destroyed, or concealed," *Calero–Toledo*, 416 U.S. at 679, 94 S.Ct. at 2090, notice or delay would compromise the government's enforcement goals. *Cf.* Sir Nicolas Browne–Wilkinson, *Territorial Jurisdiction and the New Technologies*, 25 Israel L.Rev. 145, 149–52 (1991) (speed of electronic transfers has required the Chancery Court of the High Court in London to expand its jurisdiction over foreign funds).

Generally, it is only where a residence is at stake that courts recognize the necessity of preliminary notice and hearing before seizure. *See United States v. 4492 South Livonia Rd., Livonia, N.Y.*, 889 F.2d 1258, 1265 (2d Cir.1989) (contrasting proceeding against home with proceeding against funds; in the latter, government may forgo pre-seizure hearing). *But see United States v. 16 Clinton Street, N.Y.*, 730 F.Supp. 1265, 1271–72 (S.D.N.Y. 1990) (seizure of building that contained stores in addition to apartments valid even without notice and hearing). *See generally* Jack Yoskowitz, *The War on the Poor: Civil Forfeiture of Private and Public Housing*, 1992 Colum.J.L. & Soc.Probs. (forthcoming). By contrast, electronic funds transfers occur almost instantaneously. The government must be permitted to act swiftly. There is no time or warrant for any independent evaluation by the banks that would interfere with execution of national forfeiture policy. The claimants can and should look for protection in proceedings involving the government as they are now doing in the *All Funds* case.

The banks were acting as agents of the court and should be protected. *Cf. K/S Norman Agathe v. Sea Trade & Constr., Ltd.*, 767 F.Supp. 60, 62–63 (S.D.N.Y.1991) (bank was acting as agent of the court when it executed writ of attachment and as such should be protected); *Camacho v. Autoridad de Telefonos*, 868 F.2d 482, 489–90 (1st Cir.1989) (semi-public telephone companies immune from liability where following directives of federal agents). The ability of intermediary banks to rely on court orders without risk of liability is essential to the financial health of this industry. Jeffrey S. Tallackson & Norma Vallejo, *International Commercial Wire Transfers: The Lack of Standards*, 11 N.C.J. Int'l L. & Com. Reg. 639, 665 (1986).

## VI. CONCLUSION

Plaintiffs have failed to state a claim under any state or federal theory. No liability can be found where the banks were in good faith following government orders respecting claimed government funds. There is not the slightest suggestion of bad faith by the banks. Summary judgment for the defendants is granted. The complaint is dismissed.

SO ORDERED.